[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16094
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 3, 2006
THOMAS K. KAHN
CLERK

BIA No. A96-270-718

DORIS DE LA INMACULAD TAVERA LARA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 3, 2006)**

Before BIRCH, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

Doris de la Inmaculad Tavera Lara, proceeding pro se, petitions for review

of the final order of the Bureau of Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") denying her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231, and relief under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c). A liberal construction of Tavera Lara's brief challenges the IJ's adverse credibility finding and denial of relief as not based on cogent reasons or supported by substantial evidence. Because we find the IJ's reasons to be cogent and decision to be supported by substantial evidence based on the record taken as a whole, we DENY Tavera Lara's petition.

## I. BACKGROUND

Tavera Lara, a Colombian native and citizen, last entered the United States on 27 December 2001 as a nonimmigrant visitor for pleasure with authorization to remain until 26 December 2002. In early December 2002 she submitted an application for asylum and withholding of removal on the ground that she had suffered persecution in Colombia on the basis of her sexual preference. According to her application, the trouble began in November 1998 when she informed a co-worker that she was gay. She asserted that, in January 1999, she was "dismissed without any reason." Administrative Record ("AR") at 616. Shortly thereafter, she began to receive phone calls threatening her professional reputation. She further asserted that she feared "antigay groups[s] who persecute and discriminate

2

[against] gay wom[e]n" in Bogota. Id. She contended that, in 1999 and 2000, many gay women disappeared and were later found dead. Id. In July 2001, one of her friends disappeared, and this drove her decision to come to the United States in August. Id. She returned to Colombia on 17 December 2001 "to spend Christmas with [her] children." Id. at 619. While there, her "friends told her, [the woman had been found] dead." Id. at 616. She came back to the United States on 27 December 2001 and made this application for asylum and withholding of removal just under a year later.

In February 2003, Tavera Lara was issued a notice to appear, charging her with removability under INA § 237(a)(1)(B), for "remain[ing] in the United States for a time longer than permitted." Id. at 682-83. At a hearing in June 2003, she appeared pro se and testified that she was a Colombian citizen, and that she remained in the United States after her visa expired because she had filed her asylum application and had been told she could stay. Id. at 104. The IJ found that the application was not an extension of her stay, and that she was removable from the United States, as charged. The IJ then continued the hearing on Tavera Lara's asylum application several times in order to give her an opportunity to obtain legal representation.

At the hearing on her asylum application, Tavera Lara, represented by counsel and testifying in Spanish, said that she had been born in Bogota,

3

Colombia, that she most recently came to the United States in December 2001, and that she had left Colombia because she feared for her life and safety as a result of persecution and threats based on her sexual preference. Id. at 117.

At the time her first lesbian relationship developed, Tavera Lara had been working at Los Andes University for over a decade as an administrative assistant for the department of design. Id. at 122-23. She testified that she had had a cordial relationship with her coworkers, and that she went to parties with them. Id. at 123. She also considered her supervisor to be a friend. Id. She claimed that, up to that point, she had never had problems at work, was always given good evaluations, and also received promotions and raises. Id. She testified that people at work often asked why she did not have a boyfriend, but that she had never had any indication that someone at work thought that she might be gay. Id. at 124-25. Then, at a Halloween party in 1998, because she was not paying any attention to an architect that was interested in her, her supervisor asked her if she was gay, and she told him that she was. Id. at 125. Tavera Lara claimed that, initially, he did not believe her, but that she was able to convince him. Id. She explained that she decided to tell him because she thought he was her friend. Id. One or two weeks later, she contended, the attitude of her coworkers changed. Id. at 126. They were cold, distant, and did not invite her to any celebrations outside of the office. Id. In mid-November, her supervisor gave her a "firing letter." Id. Her contract, which

4

was set to terminate on 14 January 1999, would not be renewed.  Id. at 131.  She explained to her supervisor that she needed the job, but he did not change his mind.  Id. at 126-27.  She testified that, when she asked him for a letter of recommendation, he told her that if she wrote it, he would sign it.  Id. at 127.  On her last day, she testified, her supervisor finally told her that she was being fired because of her sexual preferences.  Id. at 131.  On cross examination, she admitted that technically, she was not fired, her contract simply was not renewed.

She explained that she did not have the letter terminating her contract because it was with an attorney she saw when she was thinking of suing the university for unjust firing.  Id. at 127.  She claimed that her children had later tried to locate the attorney, but he had moved from the city and they were unable to find him.  Id.

In searching for a new job, Tavera Lara went to four or five architects who had offered her jobs in the past, but none of them hired her.  Id. at 132.  She contended that they failed to hire her because of something her supervisor said when they called him for a reference, but was unable to say what exactly he might have said to them.  Id.  It was at this time, she testified, that she also started receiving harassing telephone phone calls.  Id. at 133.  She described how the first call she received began cordially: a woman caller addressed her by name, asked if she was looking for a job and inquired about her specialization.  Id. at 134.  Tavera

5

Lara said that she first believed the woman was interested in offering her a job. Id. As the conversation progressed, however, the woman began saying that Tavera Lara would not find a job in her specialization because she was a lesbian. Id.

Tavera Lara claimed that she also received calls from a man. Id. at 136. She explained that she was unsure about the frequency of calls in the beginning because she had not been home as often. Id. Similarly, she was not frightened at first because she thought the callers would tire of bothering her. Id. After the second or third call, however, she began hanging up as soon as she realized the caller was not a friend. Id. at 137. After this, she testified, the calls came on a daily basis. Id. She contended that she went to the police, who told her that they could do nothing to help her because she did not know who was calling. Id. at 138. She asked if they could "intervene" her phone number to find out where the calls were coming from, but they told her that she needed special permission. Id.

She claimed that, in November 1999, after her son had answered the phone and been told that Tavera Lara was a lesbian, she decided to change her phone number. Id. at 137. For a time, she testified, this proved an effective solution. Id. at 139. Because the callers did not have her new number, she contended, however, she then began receiving notes that were left under the door in envelopes addressed to her by name. Id. at 143. The notes included newspaper clippings about social cleansing and homosexuals along with handwritten "vulgarities and threats." Id. at

6

144. She testified that the notes said "[she] was a dirty lesbian," "was expendable," "had no right to have children," that it was shameful to be a lesbian with children, and that they "could talk to the welfare institute" and have her children taken away, especially her daughter. Id.

She said that she went to the police once in April or May 2000 after receiving a second note and that the police mocked her and laughed about the note. Id. at 146, 148. She claimed to have received the first note in approximately April 2000 and to have continued receiving them approximately once a week up until June 2001. Id. at 146-47. She claimed that, once she realized what they were, she threw most of the notes away without opening them. Id. at 149. She testified that one note, which had been opened by her children, particularly stuck in her memory because it had been a direct threat against her life. Id. This note, which she claimed arrived in June 2001, related to a lesbian who disappeared and had been found dead and stated that this could happen to her. Id. Tevara Lara was unable to produce any of these notes at the hearing.

She testified that, after a while, she also started receiving calls again. Id. at 144. She said that, according to a letter she had received from her son the week before the asylum hearing, she was still receiving calls at her apartment in Colombia. Id. at 144-46. She claimed that the notes frightened her, both for herself and for her children. Id. at 148. Tavera Lara testified that it was after

7

receiving the death threat note in June 2001 that she decided to spend some time with family in the United States to "wait for things to calm down or maybe [be] forgotten." Id. at 149.

She claimed that, beginning in January 2001 she had been trying to think of a solution because she was aware of disappearances and a "social cleaning" of homosexual women. Id. at 149-50. She talked to her friends about spending some time away from her apartment, but her friends told her that they could help only for a time. Id. at 150.

She testified that, in June 2001, she was attacked on the street by two men as she was returning home, that one of them took her arms and the other started touching her "privates." Id. at 155-56. She claimed that they called her by name and said, in a vulgar manner, that a women did not exist in order to be with another woman. Id. at 156. Further, she claimed that a police car approached and the men ran away, but that when she told the policemen what had happened, they asked if she had been harmed or robbed and, when she said no, told her there was "nothing they could do." Id. She testified that she decided to come to the United States in June 2001 after this incident and that she also wanted to come to the United States because a friend had told her that Esther Roso, another homosexual women, had been found dead. Id. at 156-57.

8

Tavera Lara came to the United States in August 2001. She testified that, at the time, she was not thinking of staying, but wanted to see if things would calm down in her absence. Id. at 157. She stayed with her father, a U.S. citizen, who was then living in Miami. Id. Tavera Lara testified that she returned to Bogota in mid-December, "trusting that [she] could stay," but that she was only able to "spend Christmas with [her] children [before she] had to come back." Id. at 158. She had gone to the St. Vincent foundation, which was closed, and a security guard told her that one of the principal members of the foundation had disappeared. Id. She claimed that this made her want to return to the United States because it made her realize that she had a big problem and bad things were happening to people really close to her. Id. at 158-59. Tavera Lara admitted that she did not know if the woman who disappeared had been a lesbian, but that everyone had said she was. Id. at 159. She returned to the United States on 27 December 2001. Id.

She explained that when she returned in December, she asked her father to file a relative petition for her, but that he refused to do so. Id. at 158. She testified that she believed that if she returned to Colombia, they would not leave her alone, and, sooner or later, there would be an attempt on her life. Id. at 160. She insisted that she had already proven that the police would not protect her. Id. She explained that she did not believe she could relocate in Colombia because the anti-homosexuality mentality was on a national level. Id. at 160-61.

9

Tavera Lara was then asked to explain discrepancies between her asylum application, her testimony at the asylum hearing up to that point, and her interview with an asylum officer, which had been conducted in English after she filed her application. She explained that the interviewing officer's statement that she did not report the phone calls to the police was incorrect. Id. at 166-67. She explained that she had not filed suit against the university for discrimination because, if she had done so, her children would have lost their scholarships. Id. at 167. She claimed that the June 2001 incident had been the first time she had been physicially assaulted and asserted that she must have been "mistaken on the dates" when she told the asylum officer that she had been attacked in February 1999. Id. at 168. When asked why she had not mentioned the attack at all in her written asylum application, although it specifically inquires as to whether the applicant has ever been harmed, Tavera Lara explained that she "did not have any assistan[ce] [i]n filing this application and maybe that's why [she] forgot." Id. Tavera Lara admitted that she had a university diploma, and explained that her understanding of English was now better then when she completed the application. Id. at 169.

Tavera Lara submitted numerous documents in support of her application, including a declaration by herself that was basically consistent with her testimony, though more elaborate in detail. In this declaration, Tavera Lara explained that she had received the note regarding the woman who had been missing and found

10

murdered with the comment that it could happen to her at the end of 2000 or the beginning of 2001. Id. Tavera Lara stated that, according to her children, the threatening calls had continued after she left Colombia in August 2001, but stopped after her daughter told one of the callers that Tavera Lara was no longer in Bogota. Id. at 272.

Tavera Lara's children submitted declarations that corroborated her claims about receiving telephonic and written threats due to her sexual preferences between 1999 and 2001. Id. at 294, 295; 250-53; 254-56. Gisela Rodriguez-Guerrero declared that she and her family knew of the problems Tavera Lara had had between 1999 and mid-2001, and that the threats must have been real because Tavera Lara suffered a radical change in her emotional stability. Id. at 296, 297. A letter from Marta Lucia Palacio V, a psychotherapist, confirmed that Tavera Lara had attended several sexual therapy and counseling sessions in 1999 "due to a profound state of anguish caused by her personal and social conflicts." Id. at 257, 258.

A letter dated 7 December 1998 and signed by Fabian Lopez Plazas, the director of the physical plant department at Los Andes University certified that Tavera Lara had worked as a Physical Plant Assistant and Drafter since January 1985, and that she "stood out because of her excellent work, accomplishment, and quality in her position." Id. at 306, 307. She also submitted copies of documents

11

extending her contract each year from 1985 through 1998, and a final settlement of work contract stating that her date of retirement was 13 January 1999. Id. at 308-37.

Also included in Tavera Lara's documentation were background materials on Colombia. A 2000 Amnesty International Report described the general human rights abuses due to the armed conflict, id. at 338, and, regarding homosexuals, stated that the "killing of so-called 'disposables' – homosexuals, prostitutes, petty criminals, drug dealers and vagrants – by police-backed 'death squads' and urban militias linked to armed opposition groups continued," id. at 340. According to the report, there was evidence that illegal paramilitary groups received the active or tacit support of the armed forces, and that government orders to the armed forces to combat these groups generally went unheeded. Id. at 339. An April 1996 report by the Inter-Church Committee on Human Rights in Latin America ("ICCHRLA") concerning repression of homosexuals in Latin America stated that a Colombian organization had documented cases of arbitrary detention, torture, or killings of homosexuals, and that in Colombia homosexuals had been both arbitrarily detained and killed by death squads. Id. at 342, 347, 351, 370, 373. This report described a climate of homophobia in Latin America, which led to a lack of documentation concerning abuses, and it stated that the social stigma associated with homosexuality "force[d] the majority of [homosexuals] to hide their sexual

12

orientation." Id. at 352. In 1995, a Colombian organization attributed 200 deaths to social cleansing, with homosexuals among the victims. Id. at 359.

An internet article from the International Gay and Lesbian Human Rights Commission ("IGLHRC") dated 13 March 2002, reported that the home of an openly gay parliamentary candidate had been attacked with a grenade in March 2002, and that he continued to receive death threats following the attack. Id. at 378, 380. The article also reported that the police provided two days of protection in connection with the attack. Id. at 380. Another article from the IGLHRC from July 2001, reported that a student active in promoting gay rights at the University of Antioquia in Medellin, Colombia, had been harassed by a university guard but that the university had taken no action. Id. at 382-86. An article from the BBC News's web site attributed over 5,000 homicides in Colombia in 2002 to social cleansing operations targeting drug addicts, prostitutes, and homosexuals. Id. at 388.

Another publication documenting social cleansing and the rights of sexual minorities in Colombia reported that the groups of people considered "disposable" and targets of social cleansing included "openly homosexual people living in poverty," and, to a "lesser and more subtle extent," also those from a wealthier social class. Id. at 412, 414. The author described a re-emergence of the gay and lesbian movement in Colombia in 1994 but reported that homosexuals were subject

13

to constant harassment by members of the police and army, who often raided bars. Id. at 435-36. The publication includes an interview with a district Human Rights Ombudsman who expressed strong anti-homosexual sentiment. Id. at 438-39. According to this publication, transvestites and prostitutes were the most common targets, and attacks were often committed by men who met their victims at gay bars. Id. The author also asserted that discrimination in the workplace and educational institutions was a worsening problem for people who acknowledged their sexual orientation. Id. at 440-41.

The 2003 State Department Country Report described the continuing violence in Colombia due to the armed conflict, and a poor but improved human rights record by the government. Id. at 449. It stated that, although civilian authorities generally maintained effective control over the security forces, there were instances where members of the security forces acted contrary to the dictates of the civilian and military authorities. Id. at 449, 464. According to the report, social cleansing killings of homosexuals and others were sometimes committed by the paramilitaries and the first nine months of 2003 had seen 229 such killings. Id. at 454. The report stated that the government had a program to protect human rights activists and other vulnerable populations, but did not indicate whether homosexuals were among the groups protected by the program. Id. at 475.

14

According to a 2002 report from the United Nations High Commissioner for Refugees ("UNHCR"), abuses and murder were reported against homosexuals and other groups in areas under strong control of irregular armed groups, primarily the AUC, but also guerilla groups, as part of social cleansing campaigns. Id. at 503. The report attributed 319 social cleansing killings taking place between June 2000 and June 2001, to paramilitaries. Id. at 492 n.18. Another 2002 UNHCR report also confirmed extrajudicial executions of a group of persons including homosexuals. Id. at 526. The report opined that many extrajudicial executions were facilitated by the failure of the armed forces to fulfill their duty to protect and defend the victims. Id. at 528. This report also stated that telephonic and written death threats were used against persons who were the targets of social cleansing campaigns, and that sexual minorities were among the groups of people identified as especially vulnerable, and subject to violations of their fundamental rights and discrimination. Id. at 529-30. The report acknowledged that the Ministry of the Interior had protection programs for groups at risk, but did not specifically state whether sexual minorities were included in these programs. Id. at 585.

The IJ also entered into evidence the 1997 profile of Colombian asylum claims and country conditions. According to that report, the Colombian government did "not discriminate against homosexuals, although . . . [u]nofficial societal discrimination undeniably exist[ed]." Id. at 230. The report indicated that

there were relatively few open homosexuals among Colombia's political and business elite.  Id.  In addition, it stated that homosexuals, particularly those involved in commercial sex, had been victims of social cleansing by vigilante groups.  Id.

After acknowledging all the evidence, background material and testimony, the IJ denied asylum, withholding of removal and CAT relief and ordered Tavera Lara removed to Colombia.  As to the background materials, the IJ conceded "that there are problems faced by homosexuals in Colombia" including "instances where individuals have been attacked."  Id. at 81.  The IJ also, however, found evidence in the record to support the contention that the "government [of Colombia] itself does not discriminate against homosexuals" and  "does try and protect individuals who are attacked because of their sexual preference."  Id. at 82.  The IJ pointed out that the latest Country Reports do "not indicate that there is persecution in Colombia  of homosexuals."  Id. at 83.  The IJ observed that persecution was an "extreme concept," which ordinarily was not satisfied by discrimination alone.  Id. at 83.

Tavera Lara testified that she had openly told her boss she was lesbian.  Id. at 83-84.   The IJ was not convinced by her claim that she had lost her job due to her sexual preference.  Id. at 84.  He pointed out that she had been unable to produce the "firing letter" and that the highly complimentary reference letter she

16

had submitted "[spoke] for itself." Id. Similarly, the IJ noted that Tavera Lara failed to produce any of the threatening notes she had received. Id.

The IJ was bothered by the inconsistencies as to date among her various accounts of her alleged attack, and particularly by the fact that, although it was perhaps the most significant and relevant event with respect to her claim, she failed to include the attack in her asylum application. Id. at 84-85, 87. He similarly found her return to Colombia to spend Christmas with her children inconsistent with her allegation that she feared for her life there. Id. at 85. The IJ further observed that, if the attack had been related to her sexual preference, "logic would dictate" that Tavera Lara would have left immediately after the attack instead of waiting until 9 August 2001. Id. at 86. Altogether, reemphasizing the inconsistencies in her accounts of the alleged physical assault and her return to Colombia in December 2001, the IJ found Tavera Lara's testimony not to be credible. Id. at 87. Then, in light of all of the exhibits and documents tendered, the IJ found that Tavera Lara failed to show either past persecution or a well-founded fear of persecution, and failed to show that she would more likely than not be tortured if returned to Colombia. Id. at 86-87.

Still represented by counsel, Tavera Lara appealed the IJ's decision to the BIA, challenging the IJ's findings that she did not have a well-founded fear of persecution, and that she was not credible. She argued, inter alia, that the IJ used

17

an incorrect standard of proof, denied relief based on speculation and conjecture, improperly admitted the asylum officer's notes, and improperly relied upon her failure to include the attack in her asylum application. More specifically, Tavera Lara asserted that the IJ's credibility findings regarding telling her boss about her sexual preferences, not leaving immediately after the June 2001 attack, and returning to Colombia in December 2001, were based on speculation and conjecture.

Not finding the IJ's factual findings to be clearly erroneous, the BIA adopted and affirmed the IJ's decision. The BIA further found no error in the admission of the asylum officer's summary of Tavera Lara's asylum interview, finding that it "present[ed] a clear record of what transpired during the interview and [that] there [wa]s no evidence suggesting that the summary [wa]s unreliable." Id. at 2. In her pro se petition to us, Tavera Lara essentially argues that (1) the IJ's adverse credibility finding is not supported by substantial evidence in the record taken as a whole and (2) if the adverse credibility finding were supported by substantial evidence, she still met her burden of proof for asylum, withholding of removal, and CAT relief based on the other evidence in the record.

## II. DISCUSSION

When the BIA issues a decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d

1262, 1284 (11th Cir. 2001). We review the IJ's opinion in this case because the BIA has adopted it in full as well as making its own finding as to the consideration of the asylum officer's interview summary. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004).

Generally, we review legal determinations by the BIA or IJ de novo. Id. at 817. We examine factual findings, including determinations of credibility, however, under the substantial evidence test. Id. at 817-18. Under this test, we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 818. "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). That evidence in the "record may support a contrary conclusion is not enough to justify a reversal." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004), cert. denied sub nom. Adefemi v. Gonzales, __ U.S. __, 125 S. Ct. 2245 (2005).

An alien who arrives in or is present in the United States "may apply for asylum." 8 U.S.C. § 1158(a)(1). To qualify for asylum, the alien must be a "refugee." Id. § 1158(b)(1)(A). A "refugee" is any person who is unwilling to return to her home country or to avail herself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. §

19

1101(a)(42)(A). The asylum applicant "bears the burden of proving such statutory 'refugee' status." Al Najjar, 257 F.3d at 1284 (citing 8 C.F.R. § 208.13(a)). An applicant satisfies this burden by showing, with specific and credible evidence: (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that her statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of . . . an opinion [or other statutory factor]." Al Najjar, 257 F.3d at 1287 (quotations and citation omitted). An applicant must show not only that she has a political opinion or religious or social affiliation, but that she was persecuted because of it. See INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992).

To establish a "well-founded fear," "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. A "well-founded fear" of persecution may be established based on (1) past persecution on account of race, religion, nationality, social group membership, or political opinion that creates a presumption of a "well-founded fear" when not rebutted by the INS; (2) a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country; or (3) a pattern or practice in the subject country of persecuting members of a statutorily

20

defined group of which the applicant is a member.  See 8 C.F.R. § 208.13(b)(1),

(2).

We have noted that persecution is "an 'extreme concept' requiring 'more than a few isolated incidents of verbal harassment or intimidation' and that '[m]ere harassment does not amount to persecution.'"  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (quoting Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000)) (alteration in original).  Furthermore, "[n]ot all exceptional treatment is persecution."  Gonzalez, 212 F.3d at 1355.

"The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. §§ 208.13(a), 208.16(b).  On the other hand, "an adverse credibility determination alone may be sufficient to support the denial of an asylum application."  Forgue v. U.S. Att'y. Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).  "The weaker an applicant's testimony . . . the greater the need for corroborative evidence."  Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005).  In making an adverse credibility determination, however, an IJ must offer "specific, cogent reasons."  Forgue, 401 F.3d at 1287.  An IJ's finding must be based on evidence in the record and not on speculation or conjecture.  Sukwanputra v. Gonzales, 434 F.3d 627, 636 (3d Cir. 2006).  Further, "minor inconsistencies and minor admissions that 'reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility

finding.'" Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); see also Chebchoub

v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001). Finally, "an adverse credibility

determination does not alleviate the IJ's duty to consider other evidence produced

by an asylum applicant." Forgue, 401 F.3d at 1287. Nevertheless, when the IJ

enumerates an applicant's inconsistencies and is supported by the record, "we will

not substitute our judgment for that of the IJ with respect to its credibility

findings." D-Muhumed, 388 F.3d at 819.

A. Adverse Credibility

Tavera Lara first challenges the IJ's adverse credibility determination in her

case. Here, the IJ's concern about Tavera Lara's credibility arose primarily from

inconsistencies regarding the alleged physical assault and the fact that she returned

to Colombia in December 2001 after having left the previous August. Tavera Lara

testified that she was physically assaulted only one time, and that this assault was

one of the reasons she decided to leave Colombia. Accordingly, we find that this is

a significant event to her case for asylum and that her failure to include the attack

in her application, particularly in light of her widely varying accounts as to the date

of the attack,[1] was properly considered by the IJ in determining her credibility.

---

[1] Although part of the administrative record, the asylum officer's interview notes were
never offered into evidence by the government. Nevertheless, the same information
demonstrating the inconsistencies was elicited during the hearing: when the government asked
Tavera Lara why she had told the asylum officer that the attack occurred in February 1999
instead of in June 2001, Tavera Lara replied that she must have erred as to the date during the

22

Nor can we find that the record compels reversal of the IJ's finding, based upon Tavera Lara's return to Colombia in December 2001, that her subjective fear of harm was not credible. Tavera Lara testified that she returned in December 2001 with the intent to remain, but stated on her application that she returned in order to spend Christmas with her children. It is not unreasonable to infer from a person's return under the circumstances Tavera Lara described, that she does not fear for her safety. Moreover, she would not have disclosed her sexual preference if she feared persecution. Tavera Lara, therefore, cannot meet her burden of showing that the IJ's adverse credibility determination was based on speculation, lacked cogent reasons, or was not supported by substantial evidence.

B. Rest of the Evidence

Tavera Lara also argues that the IJ failed properly to consider all the evidence she submitted. When the applicant offers "other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient to rely solely on an adverse credibility determination in those instances." Forgue, 401 F.3d at 1287.

Contrary to Tavera Lara's assertion, the IJ denied her claims explicitly based on a review of "the totality of the exhibits and the documents tendered." AR at 86. Even if, based upon the background evidence, the IJ found that Tavera Lara could

interview. AR at 165-69, 236-47.

23

establish the objective aspect of a well-founded fear of future persecution, the adverse credibility determination regarding the subjective component precludes relief.

Tavera Lara also complains that she has proven past persecution, which gives rise to a presumption of a well-founded fear of future persecution. First, the IJ's finding that Tavera Lara failed to establish past persecution is supported by substantial evidence in the record. The record evidence corroborated only Tavera Lara's claims of receiving written and telephonic threats. However, these harassing or threatening calls and notes "do not rise to the level of past persecution that would compel reversal of the IJ's decision." See Sepulveda, 401 F.3d at 1231. Second, even if she had proven past persecution, Tavera Lara still cannot meet the subjective prong of the well-founded fear standard. In sum, regardless of the evidence of discrimination and violence against certain groups of homosexuals in Colombia, the record does not compel reversal of the IJ's finding that Tavera Lara fails to meet the subjective fear of harm requirement for asylum.

C. Withholding of Removal

To establish eligibility for withholding of removal under the INA, the applicant must show that her "life or freedom would be threatened in that country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This standard for withholding of

24

removal is more stringent than the well-founded fear standard for asylum; thus, if an applicant is unable to meet the well-founded fear standard for asylum, she is generally unable to qualify for withholding of removal or deportation. See Al Najjar, 257 F.3d at 1292-93. Such is the case for Tavera Lara.

D. CAT Relief

In order to obtain relief under the CAT, a petitioner must show that "it is more likely than not that she will be tortured in her home country at the hands of her government or that her government will acquiesce in the torture." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (per curiam). The burden of proof for an applicant seeking withholding of removal under the CAT, like the burden for an applicant seeking withholding of removal under the INA, is higher than the burden for showing entitlement to asylum. Al Najjar, 257 F.3d at 1303-04. Thus, because Tavera Lara has failed to demonstrate a well-founded fear of persecution based on her sexual preferences, she also fails to meet the standard for relief under CAT.

## III. CONCLUSION

Tavera Lara petitions for review of the final order of the BIA, affirming the decision of the IJ, denying her application for asylum and withholding of removal under the INA and CAT. Because we find the adverse credibility finding to be

supported by substantial evidence and the denial of relief to be supported by the

record as a whole, we **DENY** Tavera Lara's petition.